## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

RITHA FULMORE, individually and on behalf of all others similarly situated,

      Plaintiff,

v.

DISH NETWORK CORP., and
DISH NETWORK LLC.

      Defendants,

---

## CLASS ACTION COMPLAINT AND JURY DEMAND

---

Plaintiff Ritha Fulmore ("Plaintiff"), on behalf of herself and all others similarly situated, asserts the following against Dish Network Corp., and Dish Network, LLC (collectively "Dish or "Defendant") based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## <u>INTRODUCTION</u>

1.    Plaintiff brings this class action against  for its (i) failure to properly secure and safeguard highly valuable, protected personally identifiable information, including without limitation, names, addresses, email addresses, phone numbers, driver's license and state identification card numbers, and Social Security numbers (collectively "PII"); (ii) failure to comply with industry standards to protect information systems that contain PII; (iii) unlawful disclosure of Plaintiff's and Class Members' PII; and (iv) failure to provide adequate notice to Plaintiff and other Class Members that their PII had been disclosed and compromised.

2.      Dish Network Corp (collectively the Dish Network LLC "Dish" or "Defendant") is a holding company with subsidiaries in two primary business units, Pay-TV, and wireless. The Pay-TV business operates under the names Dish and Sling TV.

3.      Dish offers nationwide prepaid and postpaid retail wireless services to subscribers primarily under Boost Mobile, Boost Infinite and Gen Mobile brands.

4.      On March 13, Dish emailed its customers to inform them of a "hacking incident" involving a breach of some non-specific PII.

5.      In May 2023, nearly 2 months later, Dish began publicly notifying state Attorneys General and 300,000 impacted current and former employees that their PII had been accessed and stolen by an unauthorized third-party.

6.      According to public announcements by DISH, including a Form 8-K filed with the SEC, the company experienced a cybersecurity incident on February 23, 2023. The unauthorized individual or individuals, believed to have been the Black Basta ransomware gang according to news reports, accessed a cache of highly sensitive PII.

7.      Dish did not begin contacting effected employees until May 15, 2023.

8.      According to the AG notices, the data breach occurred in February of 2023, when hackers infiltrated 's systems and copied or exfiltrated class member PII.   has admitted publicly that Plaintiff's and class members' data had been extracted from their IT systems.

9.      As a result of Dish's failures and lax security protocols, hackers gained access to computer systems and/or servers and were able to steal the personal information of millions of customers, including their Social Security numbers, phone numbers, emails, and addresses (the "Data Breach").

10. The Data Breach was a direct and proximate result of 's flawed online system configuration and design and Dish's failure to implement and follow basic security procedures.

11. Because of Dish's failures, unauthorized individuals were able to access and pilfer Plaintiff's and Class Members' PII.

12. As a result, Plaintiff and Class Members are at substantially increased risk of future identity theft, both currently and for the indefinite future. Plaintiff's and Class Members' PII, including their Social Security numbers and health information, that was compromised by cyber criminals in the Data Breach, is highly valuable because it is readily useable to commit fraud and identity theft.

13. Plaintiff, on behalf of herself and all others similarly situated, brings claims for negligence, negligence *per se*, breach of implied contract, unjust enrichment, breach of confidence, invasion of privacy—intrusion upon seclusion, violations of consumer protection statutes of their home states, violations of data protection statutes of their home states, and injunctive relief claims.

14. Plaintiff seeks damages and injunctive relief requiring Dish to adopt reasonably sufficient practices to safeguard the PII that remains in 's custody in order to prevent incidents like the Data Breach from reoccurring in the future.

15. Given that information relating to the Data Breach, including the systems that were impacted, the configuration and design of Defendant's website and systems remain exclusively in Defendant's control, Plaintiff anticipates additional support for their claims will be uncovered following a reasonable opportunity for discovery.

**JURISDICTION AND VENUE**

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1332(d), because the amount in controversy for the Class and Subclasses exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative Members of the Class and Subclass defined below, and a significant portion of putative Class and Subclass Members are citizens of a different state than Dish.

17.     This Court has personal jurisdiction over Dish because Dish is a resident of the State of Colorado.

18.     This Court also has specific personal jurisdiction over Dish related to this action because Plaintiff's claims arise out of 's contacts business in this state and district.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant maintains its principal place of business in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**PARTIES**

20.     Plaintiff Ritha Fulmore ("Plaintiff" or "Fulmore") is a resident of North Carolina. Fulmore is a former Dish employee and received a letter dated May 17, 2023, from Dish informing her that her Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised Plaintiff Fulmore's name, address, phone number, date of birth, gender, and social security number, she faces a substantial and imminent risk of fraud and identity theft.

21.      Dish Network, LLC is a Colorado limited liability company organized under the laws and regulations of the State of Colorado, and its principal place of business is in Englewood, Colorado.

22.    Defendant Dish Network Corporation is a Nevada corporation with its principal

place of business in Englewood, Colorado.

## FACTUAL ALLEGATIONS

**I.    DISH COLLECTED, STORED, AND USED THE PERSONAL
INFORMATION OF PLAINTIFF AND MEMBERS OF THE CLASS**

23.    According to Dish, it is a "connectivity company" that through its subsidiaries

provides television entertainment and technology "to millions of customers with its satellite TV

and streaming Sling TV services." It also touts itself as "poised to enter the wireless market as a

facilities-based provider of wireless services with a nationwide consumer offering and

development of the first virtualized, standalone 5G broadband network in the U.S. 's OnTech

Smart Services brand offers in-home installation of connected home devices and entertainment

solutions." is a publicly traded Fortune 250 company.

24.    Dish also has over 13,800 employees worldwide, with almost 10,000 in the

United States.

25.    Individuals such as Plaintiff and Class Members who are employed by Dish are

required, by Dish, to provide sensitive Personal Information.

**II.     ALLOWED THE PERSONAL INFORMATION OF PLAINTIFF AND
MEMBERS OF THE CLASS TO BE COMPROMISED IN A DATA
BREACH**

26.    To manage payroll, benefits and other employee services, Dish maintains a

database of employees' Private Information on its servers.

27.    Unfortunately for Plaintiff and Class Members, from February 22, 2023, through

February 27, 2023, an unauthorized third-party hacker group began accessing and exfiltrating the

Private Information of Plaintiff and Class Members (the "Data Breach").

28.    Dish became aware of the Complaint and told the SEC in an 8K filed on February 28, 2023 that "a network outage that affected internal servers and IT telephony" and that the company "became aware that certain data was extracted from the Corporation's IT systems as part of this incident [,]" which possibly "includes personal information." In March, Dish sent an email to consumers acknowledging the breach. However, Dish did not send mailed notice to its employees and former employees who were actually impacted by the breach until May 17, 2023.  This nearly three-month delay deprived Plaintiff and Class Members of the ability to take steps to mitigate the damages caused by the Data Breach.

29.    Below are relevant excerpts from the letters sent by Dish to its former employees whose information was compromised in the breach:

> On February 23, 2023, we announced that we had experienced a network outage that affected internal servers and IT telephony…We have since determined that our customer databases were not accessed in this incident. However, we have confirmed that certain employee-related records and personal information (along with information of some former employees, family members and a limited number of other individuals) were among the data extracted. The process of locating personal information in the extracted dataset and matching that information to individuals so that we could notify them was complex and time-consuming. This work was substantially completed on May 8, 2023. We then began notifying the list of persons whose personal information is confirmed to have been included, including you.

> **What Information was Involved?**
> The personal information that was in the extracted files appears to include your Social Security Number.

30.    Dish's filing with the Office of the Maine Attorney General has further confirmed that the Private Information compromised in the Data Breach includes names and other personal identifiers in "in combination with" Social Security Number(s), and Driver's license numbers.[1]

---

[1] https://apps.web.maine.gov/online/aeviewer/ME/40/ec8cf5c5-3048-4b22-baa9-10438a51e6f5.shtml

### III.    FAILED TO FULFILL ITS OBLIGATION TO PROTECT THE SENSITIVE PERSONAL INFORMATION OF PLAINTIFF CLASS MEMBERS.

31.    Given the sensitive nature of the Private Information Plaintiff and other Class Members entrusted to Dish, Dish knew, or should have known, that hackers and cybercriminals would be able to commit identity theft, financial fraud, phishing, socially engineered attacks, healthcare fraud, and other identity-related fraud if they were able to exfiltrate that data from Dish's systems. Dish knew that individuals whose Private Information was stored on their computer systems would be reasonable in spending time and effort to mitigate their damages and prevent identity theft and fraud if that data were exfiltrated.

32.    Given that Dish was on notice that it was maintaining highly valuable data, for which Dish knew there was a risk that they would be targeted by cybercriminals and knew of the extensive harm that would occur if Plaintiff's and Class Members' Private Information was exposed through a Data Breach, Dish owed a duty to safeguard that information.

33.    Because Plaintiff and Class Members entrusted them with their Private Information, Dish had a special relationship with Plaintiff and Class Members, which provided an independent duty of care. Dish owed a duty to use reasonable security measures because they undertook to collect, store and use customers' Private Information.

34.    Accordingly, Dish is liable to Plaintiff and the class for the compromise and unauthorized disclosure of Plaintiff's and Class Members' Private Information.

### IV.    DISH FAILED TO COMPLY WITH REGULATORY AND INDUSTRY STANDARDS.

35.    Because of the value of Private Information to hackers and identity thieves, companies in the business of obtaining, storing, maintaining, and securing Private Information, such as Dish, have been identified as being particularly vulnerable to cyber-attacks.

Cybersecurity firms have promulgated a series of best practices that at minimum should be implemented by sector participants including, but not limited to: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.[2] Organizations, companies, and banks—like Dish—have an added incentive to harden their networks against unauthorized penetration, because they directly control the data necessary to access consumers' financial accounts.

36.     Further, federal and state governments have likewise established security standards and issued recommendations to reduce the number and size of data breaches and the resulting harm to consumers and financial institutions. The FTC has issued numerous guides for businesses, highlighting the importance of reasonable data and cyber security practices. According to the FTC, the need for data and cyber security should be factored into all business decision-making.[3]

## A. FTC GUIDANCE AND INDUSTRY STANDARDS

37.     In 2016, the FTC updated its publication, *Protecting Private Information: A Guide for Business*, which established guidelines for fundamental data and cyber security principles and practices for business.[4] The guidelines note businesses should protect the personal

---

[2] *See Addressing BPO Information Security: A Three-Front Approach*, DATAMARK, Inc. (Nov. 2016), https://insights.datamark.net/addressing-bpo-information-security/ [https://perma.cc/NY6X-TFUY].

[3] *Start with Security: A Guide for Business* at 2, FTC (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[4] *Protecting Private Information: A Guide for Business*, FTC (Oct. 2016), https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business [https://perma.cc/9945-U4HV].

customer and consumer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.[5] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[6]

38.    The FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and (most pertinent here) verify that third-party service providers have implemented reasonable security measures.

39.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

40.    Dish also has obligations created by other federal and state laws and regulations, contracts, industry standards, and common law to maintain reasonable and appropriate physical, administrative, and technical measures to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

---

[5] *Id.*
[6] *Id.*

41.     Given the magnitude of the risk and repercussions of a data breach or attack targeting this type of data, the likelihood of a data breach or attack, and Dish's explicit awareness of these vulnerabilities, Dish should have taken every reasonable precaution in developing a robust security program and protecting Plaintiff's and the Class Members' Private Information.

42.     Yet, despite their duties, representations, and promises, Dish failed to adequately secure and protect their employees' data, allowing the Plaintiff's and Class Members' Private Information to be accessed, disclosed, and misused.

43.     Dish also owed a duty to comply with industry standards in safeguarding Private Information, which—as discussed herein—they did not do.

44.     Cyberattacks have become so notorious that the FBI and Secret Service issued an unprecedented warning in 2019 to potential targets so they were aware of, and prepared for, a potential attack.[7]

45.     The U.S. government, various U.S. and international law enforcement agencies, cybersecurity industry groups and laboratories, and numerous industry trade groups have issued warnings and guidance on managing and mitigating phishing and ransomware threats. There are industry best practices for cybersecurity related to phishing and ransomware, some of which are particularly effective.

46.     For example, in 2019, both Microsoft and Google publicly reported that using multi-factor authentication ("MFA") blocks more than 99% of automated hacks, including most ransomware attacks that occur because of unauthorized account access. Likewise, the reputable SANS Software Security Institute issued a paper stating "[t]ime to implement multi-factor

---

[7] Kochman, *supra* n.171.

authentication!"[8] An example of MFA implementation is receiving a text with a code when you input your username and password into a website; even if a cybercriminal knew your username and password, the cybercriminal would not be able to see the code on your phone and would thus be blocked from accessing your online account.

47.    In this regard, implementing MFA "can block over 99.9 percent of account compromise attacks."[9]

48.    Yet, instead of following these widely adopted industry standards, Dish failed to adequately secure and protect their customers' data, allowing the Plaintiff's and Class Members' Private Information to be accessed, disclosed, and misused.

## V.    THE VALUE OF THE COMPROMISED PRIVATE INFORMATION AND EFFECTS OF THE UNAUTHORIZED DISCLOSURE.

49.    Dish understands the protected Private Information it acquires, stores, and utilizes is highly sensitive and of significant value to the owners of the Private Information and those who would use it for wrongful purposes.

### A.  THE VALUE OF PRIVATE INFORMATION

50.    Private Information is property with inherent and sizeable market value. Its value is axiomatic, considering the market value and profitability of "Big Data" corporations in America. Alphabet Inc., the parent company of Google, aptly illustrated this in its 2020 Annual Report, when it reported a total annual revenue of $182.5 billion and net income of $40.2

---

[8] Matt Bromiley, *Bye Passwords: New Ways to Authenticate* at 3, SANS Software Security Inst. (July 2019), https://query.prod.cms.rt.microsoft.com/cms/api/am/binary/RE3y9UJ [https://perma.cc/ZSW9-QUEW]. Matt Bromiley, *Bye Passwords: New Ways to Authenticate* at 3, SANS Software Security Inst. (July 2019), https://query.prod.cms.rt.microsoft.com/cms/api/am/binary/RE3y9UJ [https://perma.cc/ZSW9-QUEW].
[9] *What Is Multi-Factor Authentication (MFA)?*, Consensus Techs. (Sept. 16, 2020), https://www.concensus.com/what-is-multi-factor-authentication/#:~:text=The%20proof%20 that%20MFA%20works, percent%20of%20account%20compromise%20attacks [https://perma.cc/RKT2-LX5Z].

billion.[10] $160.7 billion of this revenue was derived from its Google business, which is driven
almost exclusively by leveraging the Private Information it collects about the users of its various
free products and services. America's largest corporations profit almost exclusively through the
use of Private Information illustrating the considerable market value of Private Information.

51.     Criminal law also recognizes the value of Private Information and the serious
nature of the theft of such an asset by imposing prison sentences. This strong deterrence is
necessary because cybercriminals earn significant revenue through stealing Private Information.
Once a cybercriminal has unlawfully acquired personal data, the criminal can demand a ransom
or blackmail payment for its destruction, use the information to commit fraud or identity theft, or
sell the Private Information to another cybercriminal on a thriving black market.

52.     Furthermore, Private Information is a valuable commodity to identity thieves,
particularly when such data is aggregated in large numbers.  Former United States Attorney
General William P. Barr made clear that consumers' sensitive personal information commonly
stolen in data breaches "has economic value."  The purpose of stealing large caches of personal
data is to use it to defraud individuals or to place it for illegal sale and to profit from other
criminals who buy the data and use it to commit fraud and identity theft. Indeed, cybercriminals
routinely post stolen personal information for sale on anonymous websites, making the
information widely available to the criminal underworld.

53.     There is an active and robust market for this information. As John Sancenito,
president of *Information Network Associates*, a company which helps companies with recovery
after data breaches, explained after a data breach "[m]ost of the time what [data breach hackers]

---

[10] Alphabet Inc., Annual Report (Form 10-K) at 32 (Feb. 3, 2021),
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001652044/000165204421000010/goog-20201231.htm.

do is they steal the data and then they sell the data on the dark web to the people who actually commit the fraud."

54.     Thus, Plaintiff and Class Members rightfully place a high value not only on their Private Information, but also on the privacy of that data.

55.     Once stolen, Private Information can be used in a number of different ways. One of the most common is that it is offered for sale on the "dark web," a heavily encrypted part of the Internet that makes it difficult for authorities to detect the location or owners of a website. The dark web is not indexed by normal search engines such as Google and is only accessible using a Tor browser (or similar tool), which aims to conceal users' identities and online activity. The dark web is notorious for hosting marketplaces selling illegal items such as weapons, drugs, and Private Information. Websites appear and disappear quickly, making it a dynamic environment.

56.     The forms of Private Information involved in this Data Breach are particularly concerning. Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Medicare ID numbers, health plan ID numbers, and Social Security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies to update the person's accounts with those entities.

### B.  DATA BREACHES PUT CONSUMERS AT INCREASED RISK OF FRAUD AND IDENTIFY THEFT

57.     Cyberattacks and data breaches of financial services companies are especially problematic because of the potentially permanent disruption they cause to the daily lives of their

customers. Stories of identity theft and fraud abound, with hundreds of millions of dollars lost by everyday consumers every year as a result of internet-based identity theft attacks.[11]

58.    The U.S. Government Accountability Office ("GAO") released a report in 2007 regarding data breaches finding that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[12]

59.    The FTC recommends that identity theft victims take several steps to protect their personal health and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and to consider an extended fraud alert that lasts for seven years if identity theft occurs), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[13]

60.    Cybercriminals use stolen Private Information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

61.    Identity thieves can also use Social Security numbers to obtain a driver's license or other official identification card in the victim's name, but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the

---

[11] Albert Khoury, *Scam alert: 5 most costly data breaches (plus 5 states most targeted)* (July 27, 2022), https://www.komando.com/security-privacy/most-costly-data-breaches/847800/.

[12] *Private Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* ("GAO Report") at 2, GAO (June 2007), https://www.gao.gov/assets/270/262899.pdf [https://perma.cc/GCA5-WYA5].

[13] *Identity Theft Recovery Steps*, FTC, https://www.identitytheft.gov/Steps (last visited Mar. 23, 2021) [https://perma.cc/ME45-5N3A].

victim's Social Security number, rent a house or receive medical services in the victim's name, seek unemployment or other benefits, and may even give the victim's Private Information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

62.     A study by the Identity Theft Resource Center ("ITRC") found that 96.7% of identity theft victims experienced costs and/or other harms from the criminal activity. [14] This includes devastating results such as "I lost my home/place of residence" and "I couldn't care for my family." Moreover, the harms of identity theft are not limited to the affected individual and may adversely impact other associated persons and support systems, including government assistance programs. In the ITRC study, nearly one third of survey respondents had to request government assistance as a result of the identity theft, such as welfare, EBT, food stamps, or similar support systems.[15] The ITRC study concludes that "identity theft victimization has an extreme and adverse effect on each individual as well as all of the support systems and people associated with the individual."[16]

63.     The Private Information exfiltrated in the Data Breach can also be used to commit identity theft by placing Plaintiff and Class Members at a higher risk of "phishing," "vishing," "smishing," and "pharming," which are other ways for cybercriminals to exploit information they already have in order to get even more personally identifying information from a person through unsolicited email, text messages, and telephone calls purportedly from a legitimate company requesting personal, financial, and/or login credentials.

---

[14] Jason Steele, *Credit Card and ID Theft Statistics*, Creditcards.com (updated Oct. 24, 2017), https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php [https://web.archive.org/web/20171215215318/https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php].

[15] *Id.*

[16] *Id.*

64.    Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the cyber black market for years.

65.    It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the GAO, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[17]

66.    Private Information is such an inherently valuable commodity to identity thieves that, once compromised, criminals often trade the information on the cyber black-market for years.

67.    Furthermore, data breaches that expose any personal data, and in particular non-public data of any kind (*e.g.*, donation history or hospital records), directly and materially increase the chance that a potential victim is targeted by a spear phishing attack in the future, and spear phishing results in a high rate of identity theft, fraud, and extortion.[18]

68.    There is a strong probability that entire batches of stolen information from the Data Breach have yet to be made available on the black market, meaning Plaintiff and Class

---

[17] GAO Report, *supra* at 29.

[18] *See* Kelion & Tidy, (concluding that personal information such as "names, titles, telephone numbers, email addresses, mailing addresses, dates of birth, and, more importantly, donor information such as donation dates, donation amounts, giving capacity, philanthropic interests, and other donor profile information . . . . in the hands of fraudsters, [makes consumers] particularly susceptible to spear phishing—a fraudulent email to specific targets while purporting to be a trusted sender, with the aim of convincing victims to hand over information or money or infecting devices with malware").

Members are at an increased risk of fraud and identity theft for many years into the future. Indeed, Plaintiff and many Class Members are in very early stages of their lives—in their twenties and thirties. Thus, as the respective Notices advise, Plaintiff must vigilantly monitor her financial accounts for many years to come.

69.    Dish is a highly sophisticated party that regularly handles sensitive Private Information, yet it failed to establish and/or implement appropriate administrative, technical and/or physical safeguards to ensure the security and confidentiality of Plaintiff's and other Class Members' Private Information to protect against anticipated threats of intrusion of such information.

70.    The ramifications of Dish's failure to keep Plaintiff's and Class Members' Private Information secure are long lasting and severe. To avoid detection, identity thieves often hold stolen data for months or years before using it. Also, the sale of stolen information on the "dark web" may take months or more to reach end-users, in part because the data is often sold in small batches as opposed to in bulk to a single buyer.  Thus, Plaintiff and Class Members must vigilantly monitor their financial accounts *ad infinitum*.

71.    Thus, Dish knew, or should have known, the importance of safeguarding the Private Information entrusted to it and of the foreseeable consequences if its systems were breached.  Dish failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

72.    Thus, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

## VI.    THE DATA BREACH DAMAGED PLAINTIFF AND CLASS <u>MEMBERS.</u>

73.    As a result of Dish's deficient security and monitoring measures, Plaintiff and Class Members have been harmed by the compromise of their sensitive personal information, which is currently for sale on the dark web and through private sale to other cyber criminals and/or being used by criminals for identify theft and other fraud-related crimes.

74.    Plaintiff and Class Members face a substantial and imminent risk of fraud and identity theft as their names have now been linked with their Social Security numbers, bank account numbers, emails, phone numbers, and physical addresses as a result of the Data Breach. These specific types of information are associated with a high risk of fraud.

75.    Plaintiff and Class Members also suffered a "loss of value" of their sensitive personal information when it was stolen by hackers in the Data Breach. A robust market exists for stolen personal information. Hackers sell personal information on the dark web—an underground market for illicit activity, including the purchase of hacked personal information— at specific identifiable prices. This market serves to determine the loss of value to Plaintiff and Class Members.

76.    As discussed above, Plaintiff's and Class Members' stolen personal information is a valuable commodity to identity thieves.

77.    Identity thieves can also combine data stolen in the Data Breach with other information about Plaintiff and Class Members gathered from underground sources, public sources, or even Plaintiff's and Class Members' social media accounts. Thieves can use the combined data to send highly targeted phishing emails to Plaintiff and Class Members to obtain more sensitive information. Thieves can use the combined data to commit potential crimes, including opening new financial accounts in Plaintiff's and Class Members' names, taking out

18

loans in Plaintiff's and Class Members' names, using Plaintiff's and Class Members' information to obtain government benefits, filing fraudulent tax returns using Plaintiff's and Class Members' information, obtaining Social Security numbers in Plaintiff's and Class Members' names but with another person's photograph, and giving false information to police during an arrest.

78.    Plaintiff and Class Members also suffered "benefit of the bargain" damages. Plaintiff and Class Members overpaid for services that should have been—but were not—accompanied by adequate data security. Part of the interest and fees paid by Plaintiff and Class Members to Dish was intended to be used to fund adequate data security. Plaintiff and Class Members did not get what they paid for.

79.    Plaintiff and Class Members have spent and will continue to spend substantial amounts of time monitoring their accounts for identity theft and fraud, the opening of fraudulent accounts, disputing fraudulent transactions, and reviewing their financial affairs more closely than they otherwise would have done but for the Data Breach.

80.    Plaintiff and Class Members may also incur out of pocket costs for protective measures such as identity theft protection, credit monitoring fees, credit report fees, credit freeze fees, fees for replacement cards, and similar costs related to the Data Breach.

81.    Class Members who experience actual identity theft and fraud will also be harmed by the inability to use their credit or debit cards when their accounts are suspended or otherwise rendered unusable due to fraudulent charges. To the extent Class Members are charged monthly/annual fees for their credit and/or debit accounts, they are left without the benefit of that bargain while they await receipt of their replacement cards. Class Members will be harmed further by the loss of rewards points or airline mileage that they cannot accrue while awaiting replacement

cards. The inability to use payment cards may also result in missed payments on bills and loans, late charges and fees, and adverse effects on their credit, including decreased credit scores and adverse credit notations.

82.     In the case of a data breach, merely reimbursing a consumer for a financial loss due to identity theft or fraud does not make that individual whole again. On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems."

83.     A victim whose personal information has been stolen or compromised may not see the full extent of identity theft or fraud until long after the initial breach. Additionally, a victim whose personal information has been stolen may not become aware of charges when they are nominal, as typical fraud-prevention algorithms may not capture such charges. Those charges may be repeated, over and over again, on a victim's account.

84.     The risk of identity theft and fraud will persist for years. Identity thieves often hold stolen data for months or years before using it to avoid detection. Also, the sale of stolen information on the dark web may take months or more to reach end-users, in part because the data is often sold in small batches to various individuals rather than in bulk to a single buyer. Thus, Plaintiff and Class Members must vigilantly monitor their financial accounts *ad infinitum*.

**VII.    DISH'S FAILURE TO NOTIFY PLAINTIFF AND CLASS MEMBERS IN A TIMELY OR ADEQUATE FASHION EXACERBATED THE DAMAGE.**

85.     As detailed above, Dish has stated it learned of the Data Breach on February 27, 2023, but failed to even *begin* notifying Plaintiff and Class Members until May 17, 2023 via U.S. Mail.

86.     The period of almost three months during which Dish sat on the information could have been used by Plaintiff and Class Members to take steps to mitigate the damage caused by the Data Breach.

87.     Instead, and to protect its own financial interests, Dish concealed the Data Breach for almost three months, allowing the unauthorized third-party to potentially exploit Plaintiff's and Class Members' Private Information without any mitigation steps being taken. Dish did this despite *knowing that the information was in possession of had actors looking to exploit the Private Information for profit*, a fact Dish knew shortly after discovery of the Data Breach.

88.     Plaintiff and members of the classes were thus deprived of the opportunity to take any steps to prevent damage by Dish's concealment of the Data Breach and failure to provide timely and adequate notice of the Data Breach to Plaintiff and Class Members.

## CLASS ACTION ALLEGATIONS

89.     Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3) on behalf of the following Nationwide Class:

> All Dish customers whose Personal Information was compromised in the Data Breach (the "Nationwide Class" or the "Class").

90.     Plaintiff reserves the right to modify, expand or amend the above Nationwide Class definition or to seek certification of a class or classes defined differently than above before any court determines whether certification is appropriate following discovery.

## NORTH CAROLINA SUBCLASS

91.     Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3) on behalf of the following Washington Subclass:

> All Dish customers in North Carolina whose Personal Information was compromised in the Data Breach (the "North Carolina Sub Class")

92.     Plaintiff reserves the right to modify, expand or amend the above North Carolina Subclass definition or to seek certification of a class or classes defined differently than above before any court determines whether certification is appropriate following discovery.

93.     Certification of Plaintiff's claims for class-wide treatment is appropriate because all elements of Fed. R. Civ. P. 23(a) and (b)(2)-(3) are satisfied. Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

94.     **Numerosity**. All requirements of Fed. R. Civ. P. 23(a)(1) are satisfied. The Members of the Nationwide Class and the State Subclasses are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While Plaintiff is informed and believes that there are likely millions of Members of the Classes, the precise number of Class Members is unknown to Plaintiff. Class Members may be identified through objective means. Class Members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

95.     **Commonality and Predominance**. All requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) are satisfied. This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members, including, without limitation:

        a.   Whether Dish engaged in active misfeasance and misconduct alleged herein;

        b.   Whether Dish owed a duty to Class Members to safeguard their sensitive personal information;

22

    c.   Whether Dish breached its duty to Class Members to safeguard their sensitive personal information;

    d.   Whether Dish knew or should have known that its data security systems and monitoring processes were deficient;

    e.   Whether Plaintiff and Class Members suffered legally cognizable damages as a result of the Data Breach;

    f.   Whether Dish's failure to provide adequate security proximately caused Plaintiff's and Class Members' injuries; and

    g.   Whether Plaintiff and Class Members are entitled to declaratory and injunctive relief.

96.    **Typicality.** All requirements of Fed. R. Civ. P. 23(a)(3) are satisfied. Plaintiff's claims are typical of the claims of all Class and Subclass Members because Plaintiff, like other Class and Subclass Members, suffered theft of her sensitive personal information in the Data Breach.

97.    **Adequacy of Representation.** All requirements of Fed. R. Civ. P. 23(a)(4) are satisfied. Plaintiff is an adequate Class representative because she is a Member of the Classes and State Subclasses and her interests do not conflict with the interests of other Class and Subclass Members that she seeks to represent. Plaintiff is committed to pursuing this matter for the Class with the Class's collective best interest in mind. Plaintiff has retained counsel competent and experienced in complex class action litigation of this type and Plaintiff intends to prosecute this action vigorously. Plaintiff and her counsel will fairly and adequately protect the Class's interests.

98.     **Predominance and Superiority.** All requirements of Fed. R. Civ. P. 23(b)(3) are satisfied. As described above, common issues of law or fact predominate over individual issues. Resolution of those common issues in Plaintiff's case will also resolve them for the Class's claims. In addition, a class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Dish, so it would be impracticable for Members of the Class to individually seek redress for Dish's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

99.     **Cohesiveness**. All requirements of Fed. R. Civ. P. 23(b)(2) are satisfied. Dish has acted, or refused to act, on grounds generally applicable to the Nationwide Class and Subclasses such that final declaratory or injunctive relief is appropriate.

100.     Plaintiff reserves the right to revise the foregoing class allegations and definitions based on newly learned facts or legal developments that arise following additional investigation, discovery, or otherwise.

## CLAIMS FOR RELIEF

## COUNT 1

### NEGLIGENCE
**(On behalf of the Nationwide Class, or alternatively, the North Carolina Subclasses)**

101.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

102.    Dish, as an employer for Plaintiff and Class Members, obtained Plaintiff's and Class Members' Private Information from Plaintiff and/or from Plaintiff's health insurer or managed care organization.

103.    By collecting and maintaining sensitive Private Information, Dish had a common law duty of care to use reasonable means to secure and safeguard the sensitive personal information and to prevent disclosure of the information to unauthorized individuals. Dish's duty included a responsibility to implement processes by which it could detect a data breach of this type and magnitude in a timely manner.

104.    Dish owed a duty of care to Plaintiff and Class Members to provide data security consistent with the various statutory requirements, regulations, and other notices described above.

105.    Dish's duty of care arose as a result of, among other things, the special relationship that existed between Dish and Plaintiff and Class Members. Dish was the only party in a position to ensure that its systems were sufficient to protect against the foreseeable risk that a data breach could occur that would result in substantial harm to consumers.

106.    Dish was subject to an "independent duty" untethered to any contract between Plaintiff and Class Members and Dish.

107.    Dish breached its duties, and thus was negligent, by failing to use reasonable measures to protect customers' sensitive personal information. Dish's negligent acts and omissions include, but are not limited to, the following:

      a.   failure to employ systems and educate employees to protect against malware;

      b.   failure to comply with industry standards for software and server security;

      c.   failure to track and monitor access to its network and personal information;

      d.   failure to limit access to those with a valid purpose;

      e.   failure to adequately staff and fund its data security operation;

      f.   failure to remove, delete, or destroy highly sensitive personal information of employees that is no longer being used for any valid business purpose;

      g.   failure to use due care in hiring, promoting, and supervising those responsible for its data security operations; and

      h.   failure to recognize that hackers were stealing personal information from its network while the Data Breach was taking place.

108.    It was foreseeable to Dish that a failure to use reasonable measures to protect its customers' sensitive personal information could result in injury to employees. Further, actual and attempted breaches of data security were reasonably foreseeable to Dish given the known frequency of data breaches and various warnings from industry experts.

109.    As a direct and proximate result of Dish's negligence, Plaintiff and Class Members sustained damages as alleged herein. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

110.    Plaintiff and Class Members are also entitled to injunctive relief requiring Dish to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members.

## COUNT 2

### BREACH OF IMPLIED CONTRACT
**(On behalf of the Nationwide Class, or alternatively, the Subclasses)**

111.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

112.    When Plaintiff and Class Members provided their sensitive personal information to Dish in exchange for Dish's services, they entered into implied contracts with Dish under which Dish agreed to take reasonable steps to protect their sensitive personal information.

113.    Dish solicited and invited Plaintiff and Class Members to provide their sensitive personal information as part of their regular business practices. Indeed, to sign up for a Dish account—which is required to obtain certain benefits owed to Plaintiff and Class Members as members, customers, and/or policyholders of their respective insurers or managed care organizations—Dish requires customers to provide sensitive Private Information. Plaintiff and Class Members accepted Dish's offers and provided their sensitive personal information to Dish.

114.    Plaintiff and Class Members reasonably believed and expected that Dish's data security practices complied with relevant laws, regulations, and industry standards when they entered into the implied contracts with Dish.

115.    Plaintiff and Class Members paid money (directly and/or indirectly) to Dish and Plaintiff and Class Members therefore reasonably believed and expected that Dish would use part of those funds to obtain and oversee adequate data security. Dish failed to do so.

116.    Plaintiff and Class Members would not have provided their sensitive personal information to Dish in the absence of Dish's implied promise to keep their sensitive personal information reasonably secure.

117.    Plaintiff and Class Members fully performed their obligations under the implied contracts by paying money to Dish.

118.    Dish breached its implied contracts with Plaintiff and Class Members by failing to implement reasonable data security measures.

119.    As a direct and proximate result of Dish's breaches of the implied contracts, Plaintiff and Class Members sustained damages as alleged herein. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

120.    Plaintiff and Class Members are also entitled to injunctive relief requiring Dish to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members.

## COUNT 3

**BREACH OF CONFIDENCE**
**(On behalf of the Nationwide Class, or alternatively, the Subclasses)**

121.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

122.    Plaintiff and Class Members maintained a confidential relationship with Dish whereby Dish undertook a duty not to disclose to unauthorized parties the Private Information

provided by Plaintiff and Class Members to Dish to unauthorized third parties. Such Private Information was confidential and novel, highly personal and sensitive, and not generally known.

123.   Dish knew Plaintiff's and Class Members' Private Information was being disclosed in confidence and understood the confidence was to be maintained, including by expressly and implicitly agreeing to protect the confidentiality and security of the Private Information they collected, stored, and maintained.

124.   As a result of the Data Breach, there was an unauthorized disclosure of Plaintiff's and Class Members' Private Information in violation of this understanding. The unauthorized disclosure occurred because Dish failed to implement and maintain reasonable safeguards to protect the Private Information in its possession and failed to comply with industry-standard data security practices.

125.   Plaintiff and Class Members were harmed by way of an unconsented disclosure of their confidential information to an unauthorized third party.

126.   But for Dish's disclosure of Plaintiff's and Class Members' Private Information in violation of the parties' understanding of confidence, their Private Information would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Dish's Data Breach was the direct and legal cause of the theft of Plaintiff's and Class Members' Private Information, as well as the resulting damages. The injury and harm Plaintiff and Class Members suffered was the reasonably foreseeable result of Dish's unauthorized disclosure of Plaintiff's and Class Members' Private Information. Dish knew its computer systems and technologies for accepting, securing, and storing Plaintiff's and Class Members' Private Information had serious security vulnerabilities because Dish failed to observe even basic information security practices or correct known security vulnerabilities.

127.    As a direct and proximate result of Dish's breach of confidence, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen Private Information; illegal sale of the compromised Private Information on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the Private Information; lost value of access to their Private Information permitted by Dish; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Dish's Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

## COUNT 4

### INVASION OF PRIVACY – INTRUSION UPON SECLUSION
### (On behalf of the Nationwide Class, or alternatively, the Subclasses)

128.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

129.    Plaintiff shared Private Information with Dish that Plaintiff wanted to remain private and non-public.

130.    Plaintiff reasonably expected that the Private Information they shared with Dish would be protected and secured against access by unauthorized parties and would not be disclosed to or obtained by unauthorized parties or disclosed or obtained for any improper purpose.

131.    Dish intentionally intruded into Plaintiff's and Class Members' seclusion by disclosing without permission their Private Information to a third party who then sold their Private Information to other third parties on the dark web.

132.    By failing to keep Plaintiff's and Class Members' Private Information secure, and disclosing Private Information to unauthorized parties for unauthorized use, Dish unlawfully invaded Plaintiff's and Class Members' privacy right to seclusion by, inter alia:

    a.  intruding into their private affairs in a manner that would be highly offensive to a reasonable person;

    b.  invading their privacy by improperly using their Private Information properly obtained for specific purpose for another purpose, or disclosing it to unauthorized persons;

    c.  failing to adequately secure their Private Information from disclosure to unauthorized persons; and

    d.  enabling the disclosure of their Private Information without consent.

133.    The Private Information that was publicized during the Data Breach was highly sensitive, private, and confidential, as it included Social Security numbers and other Private Information.

134.    Dish's intrusions into Plaintiff's and Class Members' seclusion were substantial and would be highly offensive to a reasonable person, constituting an egregious breach of social norms.

135.    As a direct and proximate result of Dish's invasions of privacy, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen Private Information; illegal sale of the compromised Private Information on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the Private Information; lost value of access to their Private Information permitted by Dish; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Dish's Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

## COUNT 5

### DECLARATORY AND INJUNCTIVE RELIEF
### (On behalf of the Nationwide Class, or alternatively, the North Carolina Subclass)

136.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

137.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the statutes described in this Complaint.

138.    An actual controversy has arisen in the wake of the Data Breach regarding Dish's present and prospective common law and statutory duties to reasonably safeguard its customers' sensitive personal information and whether Dish is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches. Plaintiff alleges that Dish's data security practices remain inadequate.

139.    Plaintiff and Class Members continue to suffer injury as a result of the compromise of their sensitive personal information and remain at imminent risk that further compromises of their personal information will occur in the future.

140.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Dish continues to owe a legal duty to secure consumers' sensitive personal information, to timely notify consumers of any data breach, and to establish and implement data security measures that are adequate to secure customers' sensitive personal information.

141.    The Court also should issue corresponding prospective injunctive relief requiring Dish to employ adequate security protocols consistent with law and industry standards to protect consumers' sensitive personal information.

142.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, for which they lack an adequate legal remedy. The threat of another data breach is real, immediate, and substantial. If another breach at Dish occurs, Plaintiff and Class Members will not have an adequate remedy at law, because not all of the resulting injuries are readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

143.    The hardship to Plaintiff and Class Members if an injunction does not issue greatly exceeds the hardship to Dish if an injunction is issued. If another data breach occurs at Dish, Plaintiff and Class Members will likely be subjected to substantial identify theft and other damages. On the other hand, the cost to Dish of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Dish has a pre-existing legal obligation to employ such measures.

144.    Issuance of the requested injunction will serve the public interest by preventing another data breach at Dish, thus eliminating the additional injuries that would result to Plaintiff and the millions of consumers whose confidential information would be further compromised.

## **REQUEST FOR RELIEF**

Plaintiff, on behalf of all others similarly situated, request that the Court enter judgment against Dish including the following:

A.    Determining that this matter may proceed as a class action and certifying the Classes asserted herein;

B.      Appointing Plaintiff as representative of the applicable Classes and appointing Plaintiff's counsel as Class counsel;

C.      An award to Plaintiff and the Classes of compensatory, consequential, statutory, restitution, and treble damages as set forth above;

D.      Ordering injunctive relief requiring Dish to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; (iii) provide several years of free credit monitoring and identity theft insurance to all Class Members; (iv) timely notify consumers of any future data breaches; and (v) delete or destroy any legacy consumer data that it is not necessary to keep for business purposes;

E.      Entering a declaratory judgment stating that Dish owes a legal duty to secure its student loan borrowers' sensitive personal information, to timely notify consumers of any data breach, and to establish and implement data security measures that are adequate to secure sensitive personal information;

F.      An award of attorneys' fees, costs, and expenses, as provided by law or equity;

G.      An award of pre-judgment and post-judgment interest, as provided by law or equity; and

H.      Such other relief as the Court may allow.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

DATED: June 20, 2023                    **SHUMAN, GLENN & STECKER**

                                         */s/ Rusty E. Glenn*
                                         600 17th Street, Ste. 2800 South
                                         Denver, CO 80202
                                         Telephone: (303) 861-3003
                                         Facsimile: (303) 536-7849
                                         rusty@shumanlawfirm.com

                                         *Local Counsel for Plaintiff*

                                         Ian W. Sloss
                                         **SILVER GOLUB & TEITELL LLP**
                                         One Landmark Square, Floor 15
                                         Stamford, Connecticut 06901
                                         Telephone: (203) 325-4491
                                         Fax: (203) 325-3769
                                         isloss@sgtlaw.com

                                         *Additional Counsel for Plaintiff*